# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALCOA HOME EXTERIORS, INC., ALU-
REX, INC., and GUY BROCHU

        Plaintiffs,

        vs.

MILLER ALUMINUM PRODUCTS, INC.,
and LEAF-LESS GUTTER SOLUTIONS LLC,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

FILED

March 11, 2008　　TG

08cv1447

Judge KENDALL

Magistrate Judge DENLOW

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs Guy Brochu, Alcoa Home Exteriors, Inc., and Alu-Rex, Inc. ("Plaintiffs"), by

their attorneys and for their Complaint against Defendants Miller Aluminum Products, Inc. and

Leaf-Less Gutter Solutions LLC (collectively "Defendants"), state the following:

### PARTIES

1.　　Plaintiff Alcoa Home Exteriors, Inc. is an Ohio Corporation with a principal place

of business at 2600 Grand Blvd., Suite 900, Kansas City, Missouri 64108.

2.　　Plaintiff Alu-Rex, Inc. is a Canadian Corporation with a principal place of

business at 2180 rue de la Rotonde, Charny (Quebec) Canada G6X 2L8, and sub- licenses five

patents to Alcoa Home Exteriors, Inc.

3.　　Guy Brochu and Stephane Brochu are Canadian citizens and the owners of the

patents licensed to Alu- Rex, Inc. and are engaged in the design, manufacturing and distribution

of gutter shields and shielded gutters.

4.　　Defendant Miller Aluminum Products, Inc. is a Michigan corporation with a place

of business at 28345 Goddard Rd., Romulus, Michigan, 48174.  Process may be served on Miller

Aluminum Products by delivering copies of the summons and complaint to the company's registered agent, Terry Lawrence Claypool, 26671 Rinne, New Boston, Michigan 48164.

5.      Defendant Leaf-Less Gutter Solutions LLC is a Michigan limited liability company.  Process may be served on Leaf-Less Gutter Solutions by delivering copies of the summons and complaint to the company's registered agent, National Registered Agents, Inc., 712 Abbott Road, East Lansing, Michigan, 48823.

6.      Defendants Miller Aluminum Products and Leaf-Less Gutter Solutions market for sale certain gutter shields.  The products involved in this lawsuit are sold as part of the Leaf-Less Gutter Protection Systems, i.e. gutter guards, an example of which is shown in **Exhibit 1**, a copy of the Leaf-Less website.

## JURISDICTION

7.      This Court has jurisdiction over Plaintiffs' patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a).

8.      This Court has personal jurisdiction over Defendants because they have transacted and is transacting business in this District, both generally and regarding the allegations in this Complaint, and because Defendants have committed tortious acts within this District.  Plaintiffs purchased Defendants' infringing gutter guards, *see infra* ¶16, in the Northern District of Illinois as shown by **Exhibit 2**.

9.      Venue properly lies in this Court under 28 U.S.C. §§ 1391(b), (c) and 1400(b) because Defendants are subject to personal jurisdiction and have committed acts of patent infringement in this District.

## FACTS COMMON TO ALL COUNTS

10.    On December 5, 2006, United States Patent No. 7,143,549 ("the '549 patent"), entitled *Gutter Guard*, was duly and legally issued by the United States Patent and Trademark Office.  A copy of the '549 patent is attached hereto as **Exhibit 3**.

11.    Plaintiff Guy Brochu is the sole owner of the '549 patent.  Guy Brochu has exclusively licensed the '549 patent to Plaintiff Alu-Rex.  A copy of the exclusive license is attached hereto as **Exhibit 4**.

12.    Alu-Rex has exclusively sub-licensed the '549 patent to Plaintiff Alcoa Home Exteriors, Inc.  A copy of the exclusive sub-license is attached hereto as **Exhibit 5**.

13.    Plaintiff Alu-Rex and Alcoa Home Exteriors manufacture and sell in the United States gutter shields that embody the inventions claimed in the '549 patent.

14.    Plaintiffs are in the process of complying with any applicable marking requirements of 35 U.S.C. § 287 with respect to the '549 patent.

## COUNT I
### (Federal Patent Infringement by Defendants Miller Aluminum Products, Inc. and Leaf-Less Gutter Solution, LLC)

15.    Plaintiffs incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 14.

16.    Defendants are infringing the '549 patent under 35 U.S.C. § 271(a) by making, using, selling, and/or offering for sale gutter guards that embody the patented inventions; by inducing infringement under 35 U.S.C. § 271(b), and/or, by contributing to infringement under 35 U.S.C. § 271(c).

17.    Plaintiffs have been damaged as a direct result of Defendants' infringement. Plaintiffs have lost profits and royalties as a direct result of the infringement and are entitled to

damages adequate to compensate them for the infringement in an amount that is in no event less than a reasonable royalty under 35 U.S.C. § 284.  Plaintiffs may also be entitled to recover prejudgment interest, costs, and up to treble damages under 35 U.S.C. § 284 for any willful infringement.  Further, if this is an exceptional case under 35 U.S.C. § 285, Plaintiffs should be awarded their attorneys' fees.

18.    By reason of Defendants' infringement of the '549 patent, Plaintiffs have suffered and will continue to suffer irreparable harm and impairment of the value of their patent rights, are threatened with continuing loss of sales to their existing and potential customers, are losing and will continue to lose the goodwill of their customers, and are suffering the violation of their patent rights, all of which will continue unless Defendants are preliminarily and permanently enjoined by this Court from infringing the '549 patent under 35 U.S.C. § 283.

WHEREFORE, Alcoa Home Exteriors, Alu-Rex and Guy Brochu request that this court enter the following orders and judgments:

(a)    Preliminary and permanently enjoining and restraining the Defendants, their officers, directors, agents, dealers, representatives, servants, and employees, and all parties acting in concert or participation with them, from the following in the United States:

(1)    making, using, selling, practicing, or offering to sell the invention of U.S. Patent No. 7,143,549;

(2)    contributing to the infringement of U.S. Patent Nos. 7,143,549;

(3)    inducing infringement of U.S. Patent Nos. 7,143,549;

(b)    Finding Defendants' infringement and other unlawful acts to be willful, if appropriate;

(c)    Ordering an accounting of and awarding the Plaintiffs such damages, profits, royalties, attorneys' fees, costs, prejudgment interest, and enhanced damages as may be shown by the evidence;

(d)    Finding this to be an exceptional case if appropriate and awarding the Plaintiffs their reasonable attorney fees under 35 U.S.C. § 285;

(e)    Awarding Plaintiffs such other and further relief as the Court deems just and proper.

## JURY DEMAND

A trial by jury on all triable issues in this Complaint is demanded.

Respectfully submitted,

BELL, BOYD & LLOYD LLP

Kara F. Cenar
Natalie A. Remien
Jeana R. Lervick
BELL, BOYD & LLOYD LLP
70 West Madison Street
Suite 3100
Chicago, Illinois 60602
Telephone: (312) 372-1121
Telecopier: (312) 827-8000

March 11, 2008     TG

08cv1447

Judge KENDALL

Magistrate Judge DENLOW

# EXHIBIT 1



## CALL 1-866-GUTTER6 TODAY!





- Appealing low profile design.

- Sizes to securely fit both 5" and 6" gutter profiles.

- Made from non-corrosive, weather resistant aluminum that resists dents and distortion.

- Backed by a product warranty protection package.

- A Low-Maintenance solution to gutter cleaning.

- Leaf-Less keeps the leaves and debris from accumulating in your gutter system

- Water flows as designed through the system and away form the foundation and basement walls.



Copyright 2007-2008. LEAF-LESS.COM. All rights reserved.

1 of 1

EXHIBIT 1

March 11, 2008     TG
08cv1447
Judge KENDALL
Magistrate Judge DENLOW

# EXHIBIT 2

# NORANDEX/REYNOLDS
# CUSTOMER ORDER

## CASH SALE
## 70830

BRANCH NO:    617
4621 W. 136TH ST.

708-385-1096                      IL        60445

DATE GENERATED:        REQUESTED DELIVERY DATE :
01/10/08                    01/10/08

CUST NO. 00088
PAGE 01    **********CASH SALE**********
PALOS ACE HARDWARE      SHIPPING INSTRUCTIONS    DELIVERY NOTES:
6465 W 127TH ST        1 CUST PICK-UP
PALOS HTS              IL                              76.72        CARD
60463                 KEYED BY    DJ

BPICK035 N7.6

| .N | PART-NUMBER | ORD. QUAN. | SHIP QUAN. | U/M | DESCRIPTION | DELIVERY DATE |
|----|-------------|------------|------------|-----|-------------|---------------|
| 01 | 9002-0830-00 | 4 | 4 | EA | 5" LEAF-LESS GUTTER PROTECTION 10' | 01/10/08 |

0990412991
NORANDEX/REYNOLDS #617
4621 W. 136TH STREET
CRESTWOOD, IL  60445
708-385-1096

**Sale**

ID: 00000001
01/10/08                      14:03:21
Batch #: 000109

VISA
XXXXXXXXXXX9024
Appr Code: 01118C        Invoice#: 000529
Total:                    : $ 76.72

Customer Copy
THANK YOU!!

ILLED BY: Bonder            DATE FILLED: 1/10/2008

USTOMER SIGNATURE: _____    DATE RECEIVED: 1/10/2008
                              ST PO:
    PO Ref.
] NO CUSTOMER AVAILABLE AT JOBSITE
ELIVERY SITE INFO_____
    FULFILLMENT OF THE ORDER AND THIS DELIVERY ARE MADE ONLY UNDER
    THE TERMS AND CONDITIONS ON THE SALES INVOICE.
    This material cannot be returned without our written permission
    Returned material is subject to a handling charge.

    SHIP TO :

## EXHIBIT 2

March 11, 2008     TG

08cv1447

Judge KENDALL

Magistrate Judge DENLOW

# EXHIBIT 3



US007143549B2

## (12) United States Patent
Brochu

(10) Patent No.: **US 7,143,549 B2**
(45) Date of Patent: *Dec. 5, 2006

(54) **GUTTER GUARD**

(76) Inventor: **Guy Brochu**, 3031 rue des Chatelets, #214, St-Foy, Quebec G1V 2X6 (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 175 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/635,830**

(22) Filed: **Aug. 6, 2003**

(65) **Prior Publication Data**

US 2005/0028452 A1    Feb. 10, 2005

(51) **Int. Cl.**
*E04D 13/00* (2006.01)

(52) **U.S. Cl.** .................................................... 52/12

(58) **Field of Classification Search** ................... 52/11, 52/12

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2,613,621 A * 10/1952 Schraeder ...................... 52/12

| | | | |
|---|---|---|---|
| 4,553,356 A | * | 11/1985 | Pepper ...................... 52/11 |
| 4,941,299 A | * | 7/1990 | Sweers ...................... 52/12 |
| 5,189,849 A | * | 3/1993 | Collins ...................... 52/12 |
| 5,557,891 A | * | 9/1996 | Albracht ...................... 52/12 |
| 5,848,857 A | * | 12/1998 | Killworth et al. ...................... 405/118 |
| 6,427,388 B1 | * | 8/2002 | Brochu ...................... 52/12 |
| 2002/0073631 A1 | * | 6/2002 | Baker ...................... 52/12 |
| 2003/0110712 A1 | * | 6/2003 | Brochu ...................... 52/12 |

* cited by examiner

*Primary Examiner*—Peter M. Cuomo
*Assistant Examiner*—Joe Edell
(74) *Attorney, Agent, or Firm*—Eric Fincham

(57) **ABSTRACT**

A device for protecting a gutter having a rear wall, front wall and a bottom wall, the walls defining a trough there between, the device comprising a guard member having generally planar central portion with one side thereof having an inverted U-shaped configuration designed to fit over an upper marginal edge of the rear wall of the gutter while at the other side, there is provided an overflow wall. The guard and gutter are attached directly to a supporting structure by means of screws or other mechanical fastening devices.

**8 Claims, 4 Drawing Sheets**



**EXHIBIT 3**



Fig. 1



**Fig. 2**



**Fig-3**



Fig-4



Fig-5



*Fig-6*



*Fig-7*

| 1 | 2 |

# GUTTER GUARD

## FIELD OF THE INVENTION

The present invention relates to a shield for a rain water gutter assembly also known as an eaves trough.

## BACKGROUND OF THE INVENTION

The use of shields for gutters or eaves troughs is well know in the prior art and many patents have issued for different types of shields. The purpose of the gutter shield is essentially to permit passage of rain water from the roof to the gutter or eaves trough while protecting the same from extraneous foreign matter such as leaves and the like, which could lead to clogging.

In practice, the use of a shield or a guard comprises a member which is apertured and permits the passage of rain water while banning the passage of extraneous material into the gutter. The shields or guards are attached in various manners to a portion to the gutter. However, many of these guards do not function as desired and access must still be had to the eaves trough for cleaning purposes.

It is also been proposed in the art to provide relatively complex structures wherein the eaves troughs are mounted for rotatable movement such that they may be emptied at desired intervals.

It is also been proposed to provide gutters which are designed to have a cover with an outer edge which curls downwardly and the water flow follows the curved portion due to its own surface tension to cascade into the eaves trough which is situated below. All extraneous material would theoretically fall to the ground. However, this concept does not always work when the volume of water becomes sufficiently large so that the surface tension is not sufficient to cause all the water to flow into the gutter. Consequently, there is an overflow.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a novel gutter guard which is securely fixed to the eaves trough on both sides thereof and which forwards the rain water into the gutter, but excludes virtually all foreign matter.

According to one aspect of the present invention, there is provided a device for protecting a gutter wherein the gutter has a rear wall, a front wall and a bottom wall, the walls defining a trough therebetween, the device comprising a guard member having an elongated configuration with a generally planar central portion, first and second longitudinally extending opposed sides located on either side of the generally planar central portion, a plurality of apertures extending through the generally planar central portion, the first side of the guard member having an inverted U-shaped portion designed to fit over an upper marginal edge of the rear wall of the gutter, the U-shaped portion comprising an inner vertical wall and an outer vertical wall, an inturned flange located at the bottom of the outer wall to form a second generally U-shaped portion with the inturned flange being adjacent to an inner face of the gutter, the second side of the guard member having an overflow wall extending vertically upward, a generally horizontal portion extending outwardly from an upper end of the overflow wall, and an inturned flange at a distal end of the horizontal portion adjacent the underside of the horizontal portion

According to a further aspect of the present invention, there is provided a device to protect the gutter wherein the gutter has a rear wall, a front wall, and a bottom wall, the walls defining a trough there between, the device comprising a guard member having an elongated configuration with a generally planar central portion, first and second longitudinally extending sides located on either side of the generally planar central portion, a plurality of apertures extending through the generally planar central portion, the first side of the guard member having an upwardly extending wall segment, a U-shaped portion being connected to the upwardly extending wall segment, a flexible sealing member extending outwardly from the U-shaped portion, the second side of the guard member having an overflow wall extending vertically upwardly, a generally horizontal portion extending outwardly from an upper end of the overflow wall, and an inturned flange at the distal end of the horizontal portion, the inturned flange being adjacent to the underside of the horizontal portion.

In a still further aspect of the present invention, there is provided a device to protect the gutter wherein the gutter has a rear wall, a front wall, and a bottom wall, the walls defining a trough there between, the device comprising a guard member having an elongated configuration with a generally planar central portion, first and second longitudinally extending sides located on either side of the generally planar central portion, a plurality of apertures extending through the generally planar central portion, a longitudinally extending flexible sealing member secured to the first of the guard member, the flexible sealing member extending upwardly and outwardly therefrom, the second side of the guard member having an overflow wall extending generally vertically upwardly, and a horizontal portion extending outwardly from an upper end of the overflow wall, the horizontal portion being designed to rest on the gutter.

The device of the present invention provides a guard for the eaves trough to prevent foreign matter from entering into the eaves trough. This is achieved by means of appropriate sizing of the apertures formed therein. In this respect, the aperture size and aperture placement must permit adequate drainage of the water through the apertures into the eaves trough while substantially excluding any foreign matter which remains on the top and which normally would be removed by the element of wind and the like. Adequate sizing of the apertures will prevent clogging of the device.

The apertures preferably extend in diagonal rows or lines at an angle with respect to the gutter length. In preferred embodiments, the apertures have an aperture size of between 2.5 and 10 mm and even more preferably between 3.0 and 4.0 mm. As the apertures are arranged in diagonal rows, they are also preferably arranged in longitudinally extending rows.

In a longitudinally extending row, the apertures are spaced apart by a distance of between 10 and 15 mm while in a diagonal row, they are spaced apart by a distance of between 5 and 10 mm.

As will be appreciated, during a period of heavy rain, the drainage might not be instantaneous and accordingly, there is preferably provided a vertically extending wall adjacent the front wall of the gutter to prevent overflow.

In the first aspect of the invention, there is provided a device which may be supplied in various lengths such that it may be retrofitted to a gutter and/or done by the do-it yourselfer. To this end, there may be provided a connecting member for interconnecting the lengths as they are installed.

In the first embodiment, the device is secured to the gutter by mechanical fastening means while the gutter itself is also secured to the supporting structure by mechanical fastening means such as screws.

US 7,143,549 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

In the present invention, the device may be provided with a flexible sealing strip which is retained by the device and is designed above the adjoining structure to prevent water seeping between the gutter and support structure.

## BRIEF DESCRIPTION OF THE DRAWINGS

Having thus generally described the invention, reference will be made to the accompanying drawings illustrating an embodiment thereof, in which:

FIG. 1 is a perspective view of a gutter guard and an associated gutter mounted on a supporting structure;

FIG. 2 is a cross-sectional view through the gutter and gutter guard;

FIG. 3 is a detailed sectional view of the upper portion of the gutter guard showing attachment thereof;

FIG. 4 is a cross-sectional view of a further embodiment of the present invention, the view illustrating the gutter guard and means of attachment;

FIG. 5 is a perspective view of the embodiment of FIG. 4;

FIG. 6 is a cross-sectional view similar to FIG. 4 showing a modified version of the gutter guard; and

FIG. 7 is a cross-sectional view of a further embodiment of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the drawings in a greater detail and by reference characters thereto, there is illustrated in FIG. 1 a portion of a gutter generally designated by reference numeral 14 and which is attached to a supporting structure 12 to receive run-off from roof 10.

Gutter 14 is of a conventional design which is widely available in the market place and has a back wall 16 which is designed to lie substantially adjacent to the supporting structure 12. Extending between a front row 20 and back wall 16 is a bottom 18. Front wall 20 includes a lower vertical segment 22, a central arcuate segment 24 and upper vertical segment 26. As may be best seen in FIG. 3, at the upper end of upper vertical segment 26, there is provided an inwardly extending flange 28 and a reversely extending lower flange 32 connected thereto by means of a bight 30. As seen in FIG. 1, a conventional end cap 34 is utilized to seal the end of gutter 14.

According to this embodiment of the present invention, there is provided a gutter guard which is generally designed by reference numeral 36 which has a central mean planer portion 38 extending the length of gutter 14. Main central portion 38 has a first side 40, approximate back wall 16 and a second side generally designated by reference numeral 42 approximate front wall 20. Central planer portion 38 is provided with a plurality of apertures 43 which, as may seen, extend in diagonal rows in an angle of 45 degrees with respect to the length of gutter 14.

At first side 40, gutter guard 36 has an inner vertical wall 44 and an outer vertical 48 connected by a bight 46. In turn, at the lower of outer vertical wall 48, there is provided an inturned flange 50.

At the second side 42 of gutter guard 36, there is provided a vertical overflow wall 52 which is designed to prevent overflow during periods of heavy rain. Vertical overflow wall 52 terminates in a bight 54 which connects with an horizontal segment 56. In turn, horizontal section 56 continues on through bight 60 and terminates in an inturned flange 58.

Screws 62 are used to secure both the gutter 14 and gutter guard 36 to supporting structure 12. Thus, it may be seen in

FIG. 3, a screw 62 will extend through both inner vertical wall 44 and outer vertical 48 of gutter guard 36 and also thru back wall 16 of gutter 14. The inturned flange 50 helps maintain proper tension on the device.

Similarly, screws 64 are used at the second side 42 to secure gutter guard 36 to gutter 14. Again, the use of inturned flange 58 helps prevent loosening of the screws 64.

Turning to the embodiment illustrated in FIGS. 4 and 5, similar reference numerals with a prime are utilized for similar components. There is provided a gutter guard member generally designated by reference numeral 68 to be used in conjunction with a gutter (only a portion shown) having a back wall 16' and the upper vertical segment 26' of a gutter front wall. Gutter guard 68 includes a central planer portion 38' having a first side 40' and a second side 42'. Apertures 43' extend through the central planer portion 38'.

At the first side 40', gutter guard 68 has an inner vertical wall 44'. However, at the upper end of inner vertical wall 44', there is provided a top wall segment 76 and then a downwardly angled segment 78. By means of bight 80, there is also provided an upwardly angled segment 82. Downwardly angled segment 78 and upwardly angled segment 82 form a U-shaped configuration which are designed to receive one end of a sealing element 84 with the other end thereof being abutted against supporting structure 12'.

At the second side 42', guard member 68 has a structure substantially identical to that of gutter guard 36. Thus, there is provided a vertical overflow wall 52', a bight 54', and a horizontal segment 56'. At the distal end of horizontal segment 56', there is provided an inturned flange 58' which is connected thereto by means of a bight 60'.

As with the case of the previously described embodiment, a screw 62' is utilized to secure back wall 16' to supporting structure 12'. However, this embodiment also provides for a hook member 86 having a U-shaped portion 88 at one end thereof. Hook 86 is also attached by means of a screw 62' while hook 86 engages in the portion between upper inwardly extending flange 28' and lower flange 32'. It will also be noted that screw 64' is utilised to retain guard 68 in place as in the previously described embodiment.

As the guard 68 may be provided in a plurality of pieces for retrofitting, a connector 90 may be utilized which fits within the space defined by downwardly angled segment 72, inner vertical wall 44', and a central planer portion 38'.

A slightly modified arrangement of the embodiment of FIGS. 4 and 5 is shown in FIG. 6. In this arrangement, it will be noted that hook 86'' is somewhat angled while after the first side 40'', there is provided a downwardly angled wall segment 92 between planar portion 38'' and inner vertical wall 44''.

Turning to FIG. 7, there is illustrated another arrangement wherein there is provided a first upwardly extending portion 94 from planer central portion. Upwardly extending portion 94 reverses itself in a U-shaped configuration to provide an underlying portion 96 joined by means of bight 98. A further bight 100 leads into a third section 102. Between sections 96 and 102, there is provided a U-shaped portion arranged to accept a sealing strip 104.

It will be understood that the above described embodiments are for purposes of illustration only and changes and modifications may be made thereto without departing from the spirit and scope of the invention.

I claim:

1. A device to protect a gutter wherein the gutter has a rear wall, a front wall, and a bottom wall, said walls defining a trough there between, said device comprising:

a guard member having an elongated configuration with a generally planar central portion, first and second longitudinally extending sides located on either side of

US 7,143,549 B2

5

said generally planar central portion, a plurality of apertures extending through said generally planar central portion;

a longitudinally extending flexible sealing member secured to said first side of said guard member, said flexible sealing member extending upwardly and outwardly therefrom;

a member having first and second ends, said first end of said member abutting said rear wall of said gutter, said second end of said member having a hook shaped configuration;

said first side of said guard member including a U-shaped portion, said sealing member being retained between wall of said U-shaped portion and

said second side of said guard member having an overflow wall extending generally vertically upwardly, and a horizontal portion extending outwardly from an upper end of said overflow wall, said horizontal portion being designed to rest on said gutter.

2. The device of claim 1 wherein said apertures are arranged in diagonal rows extending between said first and second longitudinally extending opposed sides.

3. The device of claim 2 wherein said apertures are circular in configuration and have a diameter of between 2.5 and 10 mm.

4. The device of claim 1 wherein said first side of said guard member has a vertically extending wall, said vertically extending wall merging with an inwardly extending U-shaped portion, said sealing member being retained by said U-shaped portion.

5. The device of claim 1 wherein said first side of said guard member has an upwardly and outwardly angled wall portion, said U-shaped portion merging with said upwardly and outwardly extending portion, said U-shaped portion retaining said sealing member.

6. In combination an eavestrough having a rear wall, a front wall, a bottom wall, said walls defining a trough

6

therebetween, and an inwardly extending portion located adjacent said front wall, a recess defined by said inwardly extending portion, and;

a guard member having an elongated configuration with a generally planar central portion, first and second longitudinally extending sides located on either side of said generally planar central portion, a plurality of apertures extending through said generally planar central portion;

a longitudinally extending flexible sealing member secured to said first side of said guard member, said flexible sealing member extending upwardly and outwardly therefrom;

a member having first and second ends, said first end of said member being secured to said rear wall of said gutter, said second end of said member having a hook shaped configuration engaging said recess of said eavestrough;

said first side of said guard member including a U-shaped portion, said sealing member being retained between walls of said U-shaped portion; and

said second side of said guard member having an overflow wall extending generally vertically upwardly, and a horizontal portion extending outwardly from an upper end of said overflow wall, said horizontal portion being designed to rest on said eavestrough.

7. The combination of claim 6 wherein said first side of said guard member has an upwardly and outwardly angled wall portion, said U-shaped portion merging with said upwardly and outwardly extending portion.

8. The combination of claim 7 further including a plurality of threaded fastening members, said threaded fastening members securing said horizontal portion extending outwardly from an upper end of said overflow wall to said eavestrough.

* * * * *

March 11, 2008    TG

08cv1447

Judge KENDALL

Magistrate Judge DENLOW

# EXHIBIT 4

## CONFIRMATORY LICENSE AGREEMENT

**ENTERED INTO** this 23 day of October 2007 by and between STÉPHANE BROCHU domiciled and residing at 1359 de la Montagnaise Street, Lévis, Québec, G6W 5T2, CANADA and GUY BROCHU domiciled and residing at 785 Léonard Street, Apt. # 210 Québec, Québec, G1X 5H8, CANADA (hereinafter collectively referred to as the "INVENTORS") and ALU-REX INC., having its head office at 2180 de la Rotonde Avenue, Charny Québec, G6X 2L8, CANADA (hereinafter referred to as "ALU-REX") (the "AGREEMENT").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby confirm that Alu-Rex is the exclusive licensee of the Technology (as such term is defined hereinafter) solely owned by the Inventors pursuant to the License Agreement entered into between the Inventors and Alu-Rex on February 16, 2007 and effective since the incorporation of Alu-Rex on January 25, 2001 (the "LICENSE AGREEMENT"), subject to terms, conditions and restrictions, which include, without limitation, the following:

1. **DEFINITIONS**

   The following terms used in this Agreement shall have the following meanings:

   1.1 **"Authorized Use(s)"** means the use of the Technology exclusively for the creation, assembly, installation, distribution, sale and after-sale service of the Gutter Shields;

   1.2 **"Effective Date"** means January 25, 2001;

   1.3 **"Gutter Shields"** means the rounded gutters with protective shields, the roof fascia, the soffit support, the soffit structure and the gutter corner overflow deflectors developed by the Inventors and commercialized under, *inter alia* the trade-mark GUTTER CLEAN SYSTEM, as well as all other processes or Technology developed by the Inventors.

   1.4 **"Improvements"** means the modifications proposed by Alu-Rex and designed to improve the quality and efficiency of the Gutter Shields;

   1.5 **"Intellectual Property"** means, as the case may be, all the intellectual property rights of the Inventors as owners, holders, authors, registered users, licensees or in any other consumer capacity during the term of the License Agreement of the following goods:

   1.5.1 symbols, designs, emblems, insignias, pictograms, slogans, signs, plaques, forms, software or any other work protected under the *Copyright Act* and used in relation with the Inventors' activities;

   1.5.2 trade-marks, as such term is defined in the *Trademark Act*, whether registered or not, used in connection with the commercialized Gutter Shields;

   1.5.3 industrial designs used in the manufacture of the products, including the Gutter Shields, which may be subject to protection under the *Industrial Design Act*;

   1.5.4 inventions, processes, methods, techniques, whether patented or not, in accordance with the *Patent Act*, as well as trade secrets and know-how relating

**EXHIBIT 4**

- 2 -

to the Gutter Shields, including, without limitation, the American patents and patent applications described in SCHEDULE A of this Agreement.

1.6    "Industrial Property" means the Inventors' know-how, all confidential information which the Inventors do not usually disclose to their competitors, all acquired knowledge by the Inventors in the creation of the Gutter Shields and other products designed or manufactured, as well as other processes which are not yet patented, all technical information, procedures, processes, formulae, plans and specifications, technical uses, information, diagrams, designs, specifications, lists of materials, production manuals and other business information (lists of clients, suppliers, prices, bids, offers, promotional material, etc.) developed or used by the Inventors in relation with the Gutter Shields; and

1.7    "Technology" means the Intellectual Property and the Industrial Property.

2.    GRANT OF EXCLUSIVE LICENSE

2.1    Subject to the terms and conditions of the License Agreement, the Inventors have granted to Alu-Rex an international and exclusive license to exploit and commercialize the Technology exclusively within the Authorized Uses during the Term.

2.2    Alu-Rex may not grant any sub-license without the prior written consent of the Inventors who may refuse, at their sole discretion. In the event a sub-license is authorized, any sub-licensee shall undertake in writing to comply with the terms and conditions of the License Agreement.

2.3    Alu-Rex shall have the obligation to indemnify and hold the Inventors harmless of all claims of any nature relating to damages caused by Alux-Rex or any third party.

2.4    In the event of any allegation to the effect that the manufacture of the Gutter Shields is in violation of a third party's rights, Alu-Rex shall have the obligation to take up the defence of the Inventors.

2.5    Alu-Rex may not develop any Improvements to the Technology without the prior consent of the Inventors. In the event that Alu-Rex develops any Improvements, such Improvements shall be the sole and exclusive property of the Inventors. In consideration thereof, the Inventors shall grant to Alu-Rex a license to use and commercialize the Improvements in accordance with the terms and conditions of the License Agreement.

3.    TERM

Subject to prior termination in accordance with the terms and conditions of the License Agreement, the term of the License Agreement shall commence on its Effective Date and shall for a period equivalent to the duration of the patent and applications relating to the Technology (the "TERM").

[ Remainder of this page intentionally left blank. The next page is the signature page. ]

**SIGNATURES**

IN WITNESS WHEREOF, the Inventors and Alu-Rex have caused this Agreement to be executed on the date mentioned hereinabove.

(Inventors)

STÉPHANE BROCHU

GUY BROCHU

(Alu-Rex)

**ALU-REX INC.**

Per:

Name:
Title:

(End of signatures)

F:\Avocats\108021\Contrats\Confirmatory License\Confirmatory Licence (2007 10 23) (17h30) (LRR).doc

[ Signature page to the Confirmatory License Agreement ]

## SCHEDULE A

### TO THE CONFIRMATORY LICENSE AGREEMENT

### AMERICAN PATENTS AND PATENT APPLICATIONS

(i)    Brochu U.S. Patent number 6,427,388 entitled "Gutter Shield" and issued on August 6, 2002;

(ii)    Brochu U.S. Patent number 6,786,008 entitled "Eaves trough with a Gutter Shield" and issued on September, 2004; and

(iii)    Brochu U.S. Patent number 6,944,992 entitled "Gutter Shield" and issued on September 20, 2005.

(iv)    Brochu U.S. Patent number 7,143,549 entitled "Gutter Guard" and issued on December 5, 2006; and

(v)    Brochu U.S. Patent number D523,538 entitled "Eavstrough Cover" and issued on June 20, 2006.

March 11, 2008     TG

08cv1447

Judge KENDALL

Magistrate Judge DENLOW

# EXHIBIT 5

*98/12*

### SPECIFICATIONS AND AMENDMENTS TO PATENT ROYALTY AGREEMENT

**THIS SPECIFICATIONS AND AMENDMENTS TO PATENT ROYALTY AGREEMENT** is made and entered into and effective as of this 31 day of October, 2007 (hereinafter the "**Amendment**").

**WHEREAS** the parties wish to specify and amend certain provisions of the Patent Royalty Agreement executed on April 8, 2003 between ALU-REX INC., having its principal place of business at 2180 rue de la Rotonde, Charny (Quebec) Canada G6X 2L8 (hereinafter "**Alu-Rex**") and ALCOA HOME EXTERIORS, INC., having its principal place of business at 1590 Omega Drive, Pittsburgh, Pennsylvania 15205 U.S.A. (hereinafter "**Alcoa**") (hereinafter the "**Patent Royalty Agreement**"); and

**NOW THEREFORE,** in consideration of the agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, by executing this Amendment, agree as follows:

1.   **GENERAL**

1.1   **Interpretation**

   1.1.1   This Amendment is declared to be supplemental to the Patent Royalty Agreement and is to form part of and shall have the same effect as though incorporated into the Patent Royalty Agreement; unless the context or subject matter dictates otherwise.

   1.1.2   Unless otherwise indicated in this Amendment, capitalized terms used herein shall have the meaning ascribed to them in the Patent Royalty Agreement and all the provisions of the Patent Royalty Agreement, except only so far as they may be inconsistent with the expressed provisions of this Amendment, shall apply to the present Agreement.

2.   **BACKGROUND AND SPECIFICATIONS**

2.1   **Reference to the License Agreement**

   2.1.1   The parties hereby acknowledge and agree that the Licensed Patents were developed by and are exclusively owned by Stéphane Brochu and Guy Brochu (hereinafter collectively the "**Inventors**").

   2.1.2   The parties hereby acknowledge that Alu-Rex is a corporation controlled by the Inventors.

   2.1.3   The parties hereby acknowledge that the Inventors have granted to Alu-Rex exclusive world-wide license rights on its patents including, without limitation, the

## EXHIBIT 5

- 2 -

Licensed Patents, upon the terms and conditions of a license agreement which was entered into between the Inventors and Alu-Rex on February 16 2007, but which confirms the existence of the rights granted to Alu-Rex since its incorporation, January 25, 2001 (hereinafter the "License Agreement").

2.1.4    The parties hereby acknowledge and agree that the Patent Royalty Agreement is a sub-license to the License Agreement.

2.1.5    The parties hereby acknowledge and agree that Alu-Rex shall, within 30 business days of the last signature of the parties, file a request for recordation of the License Agreement, the Patent Royalty Agreement and the Amendment to the Patent Royalty Agreement with the U.S. Patent Office pursuant to Section 313 of the U.S. Manual of Patent Examining Procedures and shall promptly provide a copy of the request for recordation to counsel for Alcoa.

2.1.6    On or before the date of signing of this Specifications and Amendments to Patent Royalty Agreement, Alu-Rex agrees to provide to Alcoa a true copy of the license agreement entered into between the Inventors and Alu-Rex on February 16, 2007.

## 2.2    Consent of the Inventors and undertaking of Alcoa

2.2.1    The parties hereby acknowledge that, in accordance with the terms of the License Agreement, Alu-Rex may not grant any sub-license without the prior written consent of the Inventors and that any sub-licensee must undertake to comply with all terms and conditions of the License Agreement in writing.

2.2.2    The parties hereby agree to confirm the consent of the Inventors to the Patent Royalty Agreement by their intervention in this Amendment.

2.2.3    Alcoa hereby agrees and undertakes to comply with all the terms and conditions of the License Agreement.

2.2.4    The parties hereby agree to amend the Patent Royalty Agreement in order to comply with all the terms and conditions of the License Agreement.

## 2.3    Licensed Patents

The parties hereby agree to up-date the list of patents and patent applications set out in the definition of the Licensed Patents under the Patent Royalty Agreement.

## 3.    MODIFICATIONS

In consideration of the Preamble and of the Background Specifications set out in Article 2 of this Amendment, the parties hereby wish to amend the Patent Royalty Agreement as follows:

- 3 -

**3.1**  **MODIFICATION TO THE PREAMBLE**

The preamble of the Patent Royalty Agreement is hereby repealed and replaced by the following:

"WHEREAS Alu-Rex is the exclusive licensee of the Licensed Patents (as defined hereinafter) in accordance with the terms and conditions of the License Agreement entered into between Stéphane Brochu, Guy Brochu (hereinafter the "Licensors") and Alu-Rex on February 16 2007, but which confirms the existence of the rights granted to Alu-Rex since its incorporation, January 25, 2001 (hereinafter the "License Agreement");

WHEREAS Alcoa wishes to be granted sub-license rights in and to the Licensed Patents within the Territory (as such term is defined hereinafter) and Alu-Rex agrees to grant such rights to Alcoa under the terms and conditions set forth in this Agreement."

**3.2**  **ARTICLE 1 - DEFINITIONS**

3.2.1  Subsection 1 B. entitled "Licensed Patents" of the Patent Royalty Agreement is hereby repealed and replaced as follows:

"B. "Sub-Licensed Patents and Applications" means:

(i)    Brochu U.S. Patent number 6,427,388 entitled "Gutter Shield" and issued on August 6, 2002;

(ii)   Brochu U.S. Patent number 6,786,008 entitled "Eaves trough with a Gutter Shield" and issued on September, 2004; and

(iii)  Brochu U.S. Patent number 6,944,992 entitled "Gutter Shield" and issued on September 20, 2005.

(iv)   Brochu U.S. Patent number 7,143,549 entitled "Gutter Guard" and issued on December 5, 2006; and

(v)    Brochu U.S. Patent number D523,538 entitled "Eavstrough Cover" and issued on June 20, 2006.

3.2.2  Subsection 1C. entitled "Licensed Products" of the Patent Royalty Agreement is hereby repealed and replaced as follows:

"C. "Sub-Licensed Products" means, as of the date of this Amendment, any gutter shield or shielded gutter covered as a product by any one or more of the claims of the Sub-Licensed Patents or in any continuations, continuations-in-part or divisionals of any such Sub-Licensed Patents. "

- 4 -

**3.3    MODIFICATION TO ARTICLE 2 - GRANT**

Subsection 2 A. of the Patent Royalty Agreement is hereby repealed and replaced as follows:

"A. Alu-Rex hereby grants Alcoa full exclusive sub-license rights in and to the Sub-Licensed Patents, including the right to make, have made, use and sell the Sub-Licensed Products in the Territory. Alcoa hereby agrees and undertakes to comply with all the terms and conditions of the License Agreement. Alcoa may not grant any sub-license of its rights granted hereunder in the Territory without the prior written consent of Alu-Rex and of the inventors. Any such authorized sub-license shall be on terms no less favourable to Alu-Rex or Alcoa than the terms of this Agreement. Alcoa agrees to exert reasonable efforts to market the Sub-Licensed Products in the Territory, during the term of this Agreement, similar to Alcoa's efforts to market other gutter products."

**3.4    MODIFICATION TO ARTICLE 8 - TERMINATION**

The following Sub-section 8 E. shall be added to the Patent Royalty Agreement:

"E. In the event that the License Agreement is terminated by Alu-Rex prior to the expiration or termination of this Specifications And Amendments To Patent Royalty Agreement, Alcoa shall have the right, at its sole option, to maintain, without change, the terms and conditions of this Agreement in order to allow Alcoa to continue to benefit from its pre-existing rights hereunder. In such event, the inventors shall be considered as "Alu-Rex" under the terms and conditions of this Agreement and any modifications to this Agreement requested by the inventors shall be negotiated without delay and in good faith between the inventors and Alcoa."

**3.5    MODIFICATION TO ARTICLE 12 – INFRINGEMENT**

Subsection  5.A shall be amended as follows; 5. C. shall be added to the Patent Royalty Agreement:

"A. Alcoa has a right to bring suit for infringement of any Sub-licensed Patent at its own expense, and to join Alu-Rex and the owner(s) of the sub-licensed patents, as party plaintiffs therein, provided that Alu-Rex and the patent owner(s) have a right to be represented in any suit by their own counsel at their own expense. Alu-Rex agrees to provide reasonable assistance to Alcoa and to make available to Alcoa, without expense to Alu-Rex, any information in the possession of Alu-Rex or under its control that may be useful in connection with any such suit."

"C. Notwithstanding the language in Subsections 5.A. and 5.B. of this agreement, in the event Alcoa agrees to proceed in litigation against Kaycan and their distribution partners for infringement of the sub-licensed patents Alcoa and Alu-Rex shall each bear one-half of the cost of the litigation and shall each share in one-half of the recovery. Both parties hereby agree that Alcoa shall select counsel to jointly represent all appropriate parties."

- 5 -

4.    **MISCELLANEOUS**

4.1.1   All other conditions, representations, rights, titles, interests or other provisions contained in the Patent Royalty Agreement not otherwise modified by this Amendment shall remain in force between the parties. Reference in this Amendment or in any other document to the Patent Royalty Agreement shall, as and from the date hereof, mean the Patent Royalty Agreement as supplemented and amended by the terms hereof.

4.1.2   This Amendment may be executed in any number of counterparts with the same effect as if all parties had all signed the same document. All counterparts shall be construed together and shall constitute one and the same agreement. This Amendment may be executed by the parties and transmitted by facsimile transmission and if so executed and transmitted this Amendment shall be for all purposes as effective as if the parties had delivered an executed original Amendment.

4.1.3   This Amendment shall enure to the benefit of and be binding upon the parties and their respective heirs, executors, administrators, successors and permitted assigns.

4.1.4   Any modification to this Amendment shall be in writing, signed by both parties. If any provision of this Amendment is unenforceable for any reason whatsoever, the unenforceability shall not affect the enforceability of the remaining provisions of this Amendment and the unenforceable or invalid provision shall be severable from the remainder of this Amendment. A waiver of any breach of any provision of this Amendment shall not be construed as a continuing waiver of other breaches of the same or other provisions of this Amendment.

**SIGNATURES**

**IN WITNESS WHEREOF,** each of the parties has caused this Amendment to be executed on its behalf by a duly authorized officer all as of the date first written above.

(Alu-Rex)

**ALU-REX INC.**

Per:

Name: GUY BROCHU
Title: PRESIDENT

(Alcoa)

**ALCOA HOME EXTERIORS, INC.**

Per:

Name: John C. Wayne
Title: president

- 6 -

## **INTERVENTION**

Each of the undersigned, Stéphane Brochu and Guy Brochu, hereby intervenes to this Amendment and hereby confirms its consent (i) to the License Agreement since its execution and (ii) to this Amendment.

_____
STÉPHANE BROCHU

_____
GUY BROCHU

**(Signatures end)**

CWDOCS 549259v1